The parties who would please come forward. I believe Mr. Azmi is first. Good morning, sir. Good morning. May it please the Court, Her Honor, Azmi, for the plaintiffs. I've reserved three minutes for rebuttal, and I'm dividing our remaining 17 minutes. Twelve, I'll address political question, Alien Tort Statute and costs, and my co-counsel, Bob LeBou, will address the common law claims. Your Honor, the congressional focus of the Alien Tort Statute is to ensure the viability of a court remedy for grave international law violations committed by U.S. subjects. So the question presented in this case is whether plaintiffs' ATS claims, which do involve U.S. citizen employees of a U.S. domiciled corporation who allegedly conspired with court-martialed U.S. soldiers to torture and abuse detainees in a U.S.-run facility, whether such claims touch and concern the territory of the United States with sufficient force to displace the presumption against extraterritoriality in Kyobo, particularly where plaintiffs have no other forum to raise their claims. In order to address this question, I think we first have to clear away what was a fundamental error by the district court replicated by the defendants in this case, which is to read the Kyobo presumption to foreclose any and all claims as long as they involve torts that occur overseas. Well, that certainly is the holding of Kyobo. The question is, what does the dictum mean? Isn't that correct, the distinction? The discussion of touch and concern is dictum in the case, is it not? Your Honor, I believe the holding is that on these facts, which were four-and-cubed facts involving foreign defendants, foreign plaintiffs, foreign torts, and torts that involve aiding and abetting the Nigerian government, on those facts the presumption would still govern. But the test is still whether claims, some claims, nevertheless displace the presumption. And we know that some claims will for a number of reasons. First, Kennedy's concurrence and Alito's concurrence, Kennedy clearly anticipates that the, quote, implementation of this presumption will accommodate certain torts that are not covered by the reasoning and holding. Well, let me ask you a question if I could, because I think it's interesting that in this area that I think is perhaps properly referred to as dictum, the Court talks about all the relevant conduct took place in the United States, but then says, and even where the claims touch and concern the territory of the United States. So the Court is saying in the first sentence, conduct, and in the second sentence, claims. Do you draw any distinction there between the Court's use of two different terms in discussing this? Your Honor, I think conduct is describing the facts as presented in this case, but I do think we have to look at a claim, which I do think can be distinct from conduct, and I think we get that analysis from at least two places. First, the recent Supreme Court decision in Daimler, which dismissed ATS claims because the Court said they had no connection to any of three things, the atrocities, the perpetrators, or the victims. And so I would suggest those three things might constitute a claim, and in this case there's a connection to the atrocities. They occurred in a U.S.-run prison in Abu Ghraib. Right. The claim has to be the tort claim, though, does it not? Well, claims, I think— That the Court was referring to? Yes, but— Because that is the cause of action. That's what brings you into court. That's right. But a cause of action, I think, necessarily includes who the identity of the relevant participants in the cause of action are. And I think the second place we get guidance, not only from Kennedy's concurrence, is from the Court's decision in Morrison, Part IV of Kiobel Cites to Part IV of Morrison. And Morrison says, don't look at the relevant conduct. Look at the focus of the statute. And the focus of the Exchange Act was not necessarily where the deceptive conduct occurred. After all, in Morrison, the deceptive conduct occurred in Florida. The focus of the Exchange Act is protecting—Congress's concern was protecting purchases and sale of securities on U.S. exchanges. So even if fraud, the deceptive conduct under 10b-5 occurred abroad, Congress would still want to recognize claims that fall within the focus. And the focus of the ATS, by analogy, as Kiobel and Sosa and our historians amicus make clear, is to avoid diplomatic strife that would result from not permitting aliens to sue U.S. officials and U.S. courts for tort state cause abroad. And so the Court plainly left open the possibility, as evidenced by Kennedy's concurrence and Alito's separate concurrence, that some claims would touch concern of the United States. When you look at the existence of a sovereign government, do you look at the existence of the sovereign government at the time of the claim, the date of the offense or the conduct, or do you look at the existence of a sovereign government at the date the action was filed? And does that make a difference in this case? I think that's an interesting question, Your Honor. I would submit that you would look at the existence of control at the time the claim arose. Why is that? Because if you're worried about offending a government, aren't you more worried about— the government doesn't know whether it's going to be offended or not until the claim is filed. That gives the government notice that something is going on. So why would you look back to the date of the conduct? Well, because the—I mean, in this case, I think regardless of when the date of the conduct occurred, there could be no conceivable diplomatic strife. And I think in context, Abu Ghraib was a serious international incident at the time it occurred. It's inconceivable that the Iraqi government, such as it was, controlled by the Coalition Provision Authority, which was governed by the U.S., could have taken offense, nor could the other so-called coalition members like Germany and France, because there would be then or now no interference with their—the application of their sovereign laws. And then finally, in addition, we allege—so we've alleged that this touches concerns because first, our conduct falls within the focus of the ATS, which is holding U.S. actors responsible and not giving them a safe haven. Second, because the Rasool case that says that the presumption against extraterritoriality would not have application to areas subject to U.S. control. And then finally, we allege a number of facts, domestic conduct by the corporate defendant to continue and perpetuate the conspiracy. Yeah, that was—could you go over those? Because I was a little concerned that the Third Amendment complaint was very general, and necessarily so, because you didn't really know what was going on in those phone conversations. You know that there was—or you have alleged that there was regular, if not daily, contact. But is that sufficient in terms of—how do we know there was any conspiratorial talk going on? Your Honor, I would underscore we think it's sufficient, particularly when combined with the domicile of the corporation and the location of the torts. But to answer your factual question, we allege that the corporate defendants were approached by military and civilian whistleblowers and ignored those complaints. We allege that the contract was executed in the United States, and we allege that the corporation was in regular contact in trying to sort of manage and cover up and therefore perpetuate the conspiracy in a way that discovery and testimony will have to fill out. But our position is also that domicile, safe haven, and control, in addition to domestic actions, are what govern, and relevant conduct is not alone the touchstone. If I can turn briefly to the political question, this Court's opinion in Wray KBR I think sets the framework for evaluating whether or not a claim is justiciable, and the political question will apply if the torts under the KBR test were done pursuant to direct military control, number one. Or two, whether adjudicating the claims would implicate sensitive military judgments. Well, at the en banc hearing, the government said that the political question had not been implicated at this time. So moving forward, the district judge didn't address the political question. So should we send it back and have them address that? Or is the political question going to be implicated by evidence that you're aware of? Your Honor, I think one of two options. I think what evidence is in the record already that is subject to evaluation, the complaint in the contract suggests that there would be no political question as a matter of law. I think CACI, in its submissions to this Court, introduces evidence that has not been evaluated by the district court. The court has not addressed the political question on summary judgment. We don't have a record on the political question issue. Judge Floyd's question, though, is do we need to have that before we can proceed? I think one could, from our perspective, one could say that there is no political question based on the terms of the contract, which is before the court, which gives CACI significant discretion. It gives it authority to supervise all employees and conduct, quote, all aspects of interrogation. And that makes the contract, like Taylor and Harris, that the court recognized, would not create a political question. And I think the U.S. government's brief on the second issue demonstrates that you could adjudicate these claims by simply comparing the allegations against well-established common law and statutory norms, against conspiracy, against torture, against cruel and human degrading treatment, and in no place in that adjudication would the military decisions become relevant. It's very unlike a negligence case where to evaluate the collective responsibility at issue, you necessarily have to ask, well, what was the military's role and can we evaluate? We don't know the integration of functions here, do we? No, Your Honor. The record is silent. The record is currently silent on this. But we really don't know if we have a political question. I think that our position is I think there's enough to say there is not a political question, but I think that's right. Ultimately, it would make most sense to remand and allow those considerations to be developed and evaluated by the district court pursuant to the standards set out in Reg KBR, and then it can come up at that time, after that time, if necessary. One final question. Are we wasting time by sending it back because I rather doubt that the government or the military are going to admit or concede that they directed these people to torture or treat them inhumanly? The government did not admit that, Your Honor. Quite to the contrary. The allegations, and we believe the evidence, will demonstrate that in the command vacuum at Abu Ghraib, it was khaki employees that directed the co-conspirators to abuse detainees. That's my point. The government's not going to concede that they ordered torture. Exactly, Your Honor. Yes, that's right. In fact, yes, the government court-martialed some of the co-conspirators, which suggests this is just disreputable. The government has condemned these atrocities. The U.S. government participated in this case as an amicus and said, even at the beginning, this could be adjudicated without raising political questions. The district court has handled discovery up to this point conscientiously to protect any kind of government interests. And so, again, I think the court could dispose of the political question based on the record we have to suggest that it is justiciable. But if the court were to wish to ask whether or not there's integration, which I don't think is necessary to evaluate a political question, then I think you would have to read that. Why isn't that necessary, to know whether the functions were integrated? Well, I understand the first part of the in re KBR test say whether or not the ‑‑ because in in re KBR there was, and Harrison Taylor, there was potentially integration between the contractors and the military. The question was, was there sufficient military control that was directing the tort? Do we know that here? We know that because the key factor in KBR citing Taylor and Harris at the threshold is the terms of the contract. And did the contract give the contractor significant discretion? KBR says if the government sets out a goal but leaves the contractor to implement the goal, then there's no political question. But then when you look at the statement of work, the statement of work talks about, and that's what you're referring to, is it not? Yes, yes. Okay. It says the contractor will provide interrogation as directed by the military authority to assist, supervise, coordinate and monitor all aspects of interrogation activities. And so that kind of caught my eye, as directed by the military authority. Does that make a difference here? I don't read that as direction day to day. And if that's a factual question, we're confident that the facts would dispute that it was direction day to day. I think ultimately they're answerable to the person with whom they have the contract. But the idea that they have to monitor all aspects of interrogation activities and that the next paragraph five at the end, at 1386, responsible for providing supervision for all contractor personnel. I think in Taylor and Harris, those kinds of contractual provisions suggest the absence of military control on the record we have. So let me turn it to my co-counsel to address the common law issues. May it please the Court. Robert Labue, co-counsel for the plaintiffs. I would like to address the common law issues that are before the court. And rather than rehearse all of the arguments in our briefs, I would like to focus on what I think are two key issues. The first question that I'd like to focus on is the misapplication by the district court of the Virginia law of retroactivity with respect to the application of the statute of limitations. Even if Virginia law governed the statute of limitations issue in this case, and we have arguments in our brief that it did not, but even if it did, the result below turned on the district court's determination that the Casey decision decided in 2012 should be applied retroactively to this action that was filed in 2008, with the result that three of the four plaintiffs were non-suited because they could not take advantage of the class action tooling rule. We believe that Casey should not be applied retroactively. We rely on the leading Virginia case on retroactivity, which is the Blaylock decision quoted in our brief, and I will simply read what Blaylock sets out as the first and most prominent rule regarding retroactivity. And Blaylock says a decision should not be applied retroactively where the court either overrules past precedent or decides an issue of first impression whose resolution was not clearly foreshadowed. And it's perhaps significant that the district court, in reciting the Blaylock decision, left out the phrase decides an issue of first impression, because I think it's quite clear that applying that test to the Casey decision indicates it should not be applied retroactively. I say that for three essential reasons. Number one, the district court in this case itself believed in 2008 that the law of Virginia, as it then stood, permitted so-called cross-jurisdictional tolling. The court made that conclusion based on a 2000- Virginia's been hostile to the concept of equitable tolling forever. I mean, you know, just based on my experience, and I hate to, you know, rely on that. I don't know the extent to which it's proper, but Virginia has never embraced the concept of equitable tolling. I understand that, Your Honor, and Casey said that quite clearly, but there's also a statutory tolling issue. And back in the welding case, on which Your Honor sat back in 2002, the Virginia Supreme Court accepted the idea of cross-jurisdictional tolling. In other words, an intervening action that had been pending in a different jurisdiction could have the effect of tolling the statute of limitations. Now, to be sure- That was statutory, wasn't it? So the open question was whether a representative class plaintiff and a suit brought by such a person would toll claims by the absent class members. That was an open question in Virginia until Casey came along and said that both as a matter of equitable tolling and as a matter of statutory tolling, Virginia would not permit that to occur. But the district court in this case didn't view that as the law of Virginia in 2008. And indeed, the Second Circuit certified the Casey issue to the Virginia Supreme Court for one obvious reason, and that is that the Second Circuit thought the precise question was an open one in Virginia. Oh, it certainly was an issue of first impression. I think, isn't it the second part that's at issue here, whether its resolution was not clearly foreshadowed? And I agree with that, Your Honor. I would suggest that it was not clearly foreshadowed because certainly the issue of whether statutory tolling would apply in a situation like this was an open question. And the only decision, the closest decision on point, was welding, and that would have suggested a resolution in favor of the plaintiffs. The prejudice to our plaintiffs is obvious. Had Casey been on the books, they would have filed in Ohio, just as the district court said they should have done to preserve their position. So I think we do have the elements of the rule of not applying the decision retroactively. I say I'm out of time, but I would just like to urge on the question of choice of law, I urge upon your honors the recent decision in the KBR burn pit decision written by Judge Floyd, who observed at page 54 that combat is a word of limited scope. It's not the same as combatant activities. So I would suggest that combat operations, as used in coalition order number 17, should be given a limited construction. That order is simply a choice of law provision. It's not an immunity provision. And I'm sorry I don't have more time to address this, but unless the court has any questions. Thank you. Thank you, sir. May it please the court, I'm Bill Kegel together with John O'Connor. We represent the APALE CACI Premier Technology. The fundamental problem with the appellant's position on the ATS claim is that it's contradicted by the express holding of Kiobel. It's also a position they take after the benefit of full discovery, where they had every opportunity to attempt to identify any conduct that occurred in the United States that constituted an alleged violation of the international norms. Does it have to be conduct? The holding of Kiobel does refer to conduct, no question, and does it several times. But then they hang this dictum on, talking about touching and concerning, and they say the claims have to touch and concern the territory. Is that different from conduct? Unclear, Your Honor, but it's a distinction without a difference in this case, because all of the operative activity, all of the relevant conduct, which is defined in Kiobel as the conduct constituting the alleged violations of international norms. It's undisputed that all of that conduct alleged in this case occurred in Iraq. None of it occurred in the United States. Kiobel also makes clear that mere corporate presence is not sufficient to displace the presumption against extraterritoriality. We've got a lot more here, though. We have the alleged, I don't want to say torturers, but the people allegedly performing these acts are United States citizens. The contract was issued in Arizona, and it was issued on behalf of the U.S. government to a Fairfax County, Virginia corporation, or at least to the Chantilly office. So you have a lot more than any of these other cases, the Boumediene and Kiobel itself. You have a lot more contact of the territory of the United States by virtue of the contractual relationship of the parties. So don't we have to look at it a little differently than just rubber stamp Kiobel and look at it to say, do these contractual ties and the fact that these defendants are United States citizens performing this contract that was executed in the United States, does that make a difference? Not in this action, Your Honor. Okay. Not at all. So how would you, if you're writing the opinion of the court today, how would you write it on that issue? Kiobel looks at the location of the relevant conduct. Relevant conduct is defined as the conduct constituting the alleged violations of international norms. None of the facts that Your Honor just identified constitutes any of the conduct making of alleged violations of international norms. It's irrelevant conduct under Kiobel. No, but that wasn't my question, Mr. Cagle. No question it doesn't constitute conduct. Does it constitute part of the claim that the Supreme Court was referring to in that second sentence in Kiobel, the dictum paragraph? It does not because the claim is not contingent upon the corporate citizenship of the corporation. Is it contingent on whether the contract was properly performed? It's not contingent upon whether the contract was properly performed. Well, there's no tort if the contract was properly performed. Well, that raises one of the political question components of this action, Your Honor, because a number, in fact, most of the alleged abuse set forth in the third amended complaint constitutes interrogation techniques explicitly approved by the executive branch of the United States government. Well, while then would the United States military court-martial folks in this case? Are you saying that the United States military authorized this client to torture and commit human rights violations? No. So why isn't that a tort, to torture and to commit human rights violations? The offenses for which the soldiers were court-martialed are not the same allegations, not the same facts as the allegations against CACI. For example, Your Honor, the plaintiffs allege that they were subjected, they and others were subjected to a number of interrogation techniques, stress positions, forced nudity, sleep deprivation, the use of dogs. All of those are authorized interrogation techniques. The soldiers were not court-martialed for performing any of those techniques. They were court-martialed for offenses involving abuse not in connection with interrogations. The record is clear on that. With respect to the claims issue that you raised, Judge Keenan, I think in this case, key oval controls, the reasoning applies foursquare to this case. All of the relevant conduct occurred outside the United States. Corporate presence is not sufficient, and the fact that United States citizens engaged in conduct outside the United States is certainly not sufficient. So we're left with the contract then, and does that make a difference? I haven't heard from you why it doesn't make a difference whether the contract was properly performed. It necessarily has to be an issue as to whether there was a tort. There's one point you raised in your questioning of Mr. Osme where I'd like to, I believe, correct the record. The court appeared to be under the impression that there is no evidence with respect to the integration of the CACI interrogators. Well, yeah, except I've just asked you a question, so if you could please give that a try and then correct the record if you would. Could you please repeat your question, Your Honor? Okay. As best I can remember, the question was, I don't think you've adequately explained why the fact of the contract being executed in Arizona and accepted by CACI in Fairfax County, Virginia, and the performance of that contract, whether it was properly performed, in other words, did they go outside the contract and commit torts or did they properly perform it, why that isn't the jurisdictional hook in terms of the dictum. It seems to me if there's any hook, that's it, and maybe it's not enough, but I just would like to hear from you why in your view it isn't.  As an initial matter, it would prove too much. That would mean any time the United States government executes a contract with a civilian contractor for performance of the work outside the United States, that that would be sufficient under that approach to provide jurisdiction under ATS for alleged violations of international law. That makes no sense. It completely reads out of the equation the locus of the relevant conduct required by Kiobel. So I think that approach simply contradicts the standard established by Kiobel for extraterritorial jurisdiction under ATS. Second, the performance of the contract. The performance of the contract, well, that clearly occurred in Iraq. Again, that takes the matter outside the jurisdiction of ATS. Whether the contract was properly performed would not, if there were a finding that it was not properly performed in Iraq, that's not going to change the equation under Kiobel's analysis that the relevant conduct has to occur in the United States or there must be sufficient conduct that occurred in the United States. This contract was performed in Iraq, not in the United States. And the record evidence is undisputed that CACI's interrogators were fully integrated into the military chain of command for all purposes in connection with the performance of interrogations. On pages 53 and 54 of our brief, we have the record citations to the evidence provided by the contracting officer's representative and by the then-captain in charge of the interrogation control element at Abu Ghraib Prison. And this evidence is undisputed. It establishes beyond any doubt that the CACI interrogators were indistinguishable from military interrogators for all purposes of the performance of interrogations. It was the United States that determined who would be detained. It was the United States military who determined where they would be housed. It was the United States military, not CACI, who determined who would be interrogated, who would conduct the interrogations, what approved interrogation plan would be used, and to what use information adduced in those interrogations would be put. CACI had no role, responsibility, or involvement in those command decisions. They were made exclusively by the military, consistent with the provision in the contract that you identified, Judge Keenan, that CACI would be performing these interrogations under military direction. Now, you didn't ask the district court to address the political question issue, did you? We had not gotten to that point, Your Honor, because given Judge Lee's disposition of the case, we had not arrived at the point after discovery had concluded where we were going to file summary judgment motions that would have addressed the issues of immunity, preemption, political question doctrine, and the other issues that the court would have had to decide on summary judgment. No, Judge Lee disposed of the case before that point in time had arrived. But the evidence with respect to the plenary control by the military of interrogation operations is extensive and it's undisputed. There is simply no evidence in this record that contradicts the notion of universal plenary control of interrogation operations and CACI's performance of those operations by the military. Does there have to be integration of functions or not? Plenary control is a standard established by the Taylor decision, most recently repeated in Judge Floyd's opinion in the Barn Pit litigation, so integration would not be required. Plenary control could exist without integration, but here we have both. In addition to the plenary control, there are other factors that implicate the political question doctrine. In this action, there are no judicially manageable standards, discoverable standards that can be employed to litigate this case fully. While full discovery occurred in the district court and the plaintiffs had every opportunity to take all the discovery they so desired, CACI had several issues in discovery that were not resolved at the time of Judge Lee's disposition of the case. First, three of the four plaintiffs were denied entry into the United States after Judge Lee had issued an order compelling their attendance at depositions and medical examinations. Three of the four were denied the ability to come to the United States. The Department of Homeland Security is responsible for that, but by process of elimination, the only explanation that's available is that there is information on the terrorist watch list that led the United States to determine they should not set foot. You're just speculating now, aren't you? I think it's more than speculation, Judge Keenan, because if you look at the... How is that helpful to our analysis today, though? It demonstrates the lack of judicially manageable standards for attempting to litigate this case where the plaintiffs can't even show up, as required by court order, for depositions and medical examinations. Equally important, the identity of the interrogators who conducted the interrogations, including these plaintiffs, is classified, and the United States was unwilling to provide that information. Our motion to compel was pending at the time Judge Lee dismissed this action. But that further highlights the difficulty, if not impossibility, of attempting to manage a lawsuit of this nature. And finally, we believe that judicial involvement in attempting to adjudicate this case would demonstrate a lack of respect for the coordinate branches of the United States government. Congress has legislated extensively with respect to the issues at the heart of the plaintiffs' allegations. Congress has enacted the Torture Victims Protection Act. Torture Victims Protection Act doesn't apply, though, in this case, does it? No, it doesn't, Your Honor, because that does not apply to corporate defendants. In the plaintiffs, there are no individual... And the individual has to act under the actual or apparent authority of any foreign nation. That's correct. So that's out the window. That wouldn't apply here. But Congress has not seen fit to create a cause of action for these plaintiffs. Not in the Torture Victims Protection Act, not in the War Crimes Act, not in the Anti-Torture Statute, not in the Detainee Treatment Act, not in the Military Extraterritorial Jurisdiction Act. Despite extensive legislation, Congress has not determined to provide anything other than an administrative claims process for plaintiffs such as these. With respect to the statute of limitations applicable to the three plaintiffs that we refer to as the Rashid plaintiffs, perhaps the most significant aspect of the plaintiff's argument is what's not said. Neither their brief nor their oral argument provides any citation or reference to the Fourth Circuit's 1999 decision in Wade, in which the Fourth Circuit made very clear the view that Virginia does not recognize equitable tolling. I believe you are absolutely correct, Judge Keenan, in indicating that the Commonwealth of Virginia has a longstanding disavowal of equitable tolling. That's the general backdrop. The more specific point is this Court, back in 1999, indicated that the Virginia Supreme Court would not recognize equitable tolling in circumstances such as these. Judge Lee, in 2008, disregarded this Court's holding in Wade, issued his own decision relying upon welding, which concerned not equitable tolling but statutory tolling. And it was the confusion created by Judge Lee's decision that led the Second Circuit, in certifying the question to the Virginia Supreme Court, to ask for the Virginia Supreme Court's ruling. And that Court held unanimously, unequivocally, and rather forcefully, that Virginia does not now nor has it ever recognized equitable tolling in these circumstances. That decision could come as no surprise, given the Wade decision and the history of Virginia jurisprudence. No reasonable surprise whatsoever. It can't be regarded as a decision that was simply not foreshadowed by developments or by the status of the developments in Virginia law. With respect to the claim that Mr. Alshamari attempts to assert under Virginia law, and actually before I leave the statute of limitations, I should note that the plaintiffs were late converts to the view that Ohio law should apply to their claims. In the district court, they had originally argued that Virginia law should apply. And everyone was on the same page in arguing that Virginia law should apply. Judge Lee, in 2008, construed Virginia law in a manner that is now clearly incorrect under the Supreme Court's decision in Casey. But it was only after Casey came down that the plaintiffs had an epiphany and determined that, well, after all, Virginia law should be disregarded and Ohio law should apply. We think under Ferens, the Supreme Court's decision is a model of clarity. When plaintiffs do not file suit in a distant forum, they cannot take advantage of the law of the transferor court. Every court that's addressed the issue has decided precisely that. Is there a distinction, though, in Ferens, that the Rashid appellates did not file a new action, they just joined an existing action governed by Ohio's choice of law principles? It's a distinction without a difference, Your Honor, because the ruling in Van Dusen, which holds that the law of the transferor court will follow the action when it goes to a transferee forum, is designed to prevent forum shopping by a defendant, designed to avoid a defendant persuading a court to transfer the case to a second forum in order to take advantage of more favorable law in the transferee court, that the plaintiff is given any advantage of the law of the forum that the plaintiff initially selected. That rationale does not apply to plaintiffs that never went to the original forum, which was the case with the Rashid plaintiffs. Mr. Alshamari's claim, which we believe would be governed by Iraq law, is simply foreclosed by CPA Order 17. The plaintiffs appear to rely upon a later and rather somewhat different version of CPA Order 17. But the version in force and effect at the time of the acts alleged here made it quite clear that any claims had to be submitted to the parent state under the national laws of the parent state, and the only process provided under the national laws of the United States for these claims would be an administrative claims remedy. Well, what do you do about the Fifth Circuit case that said that CPA Order 17 has been interpreted as calling for the application of state, not national law? I think there's three answers to that, Judge Floyd. First, the Fifth Circuit's decision in McGee concerns a later version of CPA Order 17 that is not applicable here. Second, the court noted in its decision that that issue had not been argued in the briefs, was barely touched upon at oral argument, and it appears the Fifth Circuit made that decision without any meaningful input from counsel. Had there been that opportunity, I believe that the argument would have pointed out that the term that is used in that version of CPA Order 17 is sending state, and it appears the Fifth Circuit simply assumed without any analysis that Louisiana was the sending state. Now, the reference to national law is also omitted from that version of CPA Order 17. That allowed the court, I think, to take a somewhat easier path to conclude that, well, somehow Louisiana law should apply. But I think the court was simply wrong in concluding that Louisiana was a sending state as that term is used in that version of CPA Order 17 because states in the United States of America do not send troops to Iraq. The United States sends troops to Iraq. No state in the United States could determine, consistent with the Supreme Court precedent, that it's not going to allow its citizens to go to Iraq. No, the sending states under CPA Order 17 were the countries that contributed troops, personnel, and supplies to the coalition provisional authority, not to individual states within a country, including the United States. So I think the Fifth Circuit decision, while perhaps interesting, is both irrelevant because it deals with a distinctly different version of CPA Order 17 and on that law is simply incorrect. Louisiana is not a sending state as that term is used in that version of the order. Thank you, Your Honors. All right, sir. Mr. Asmey, you have some rebuttal, I believe. The premise of defendant's position rests entirely on the notion that the international law violation has to occur in the United States. That cannot be the rule, not only because of distinction between conduct and claims Judge Keenan identified, but also because that's the position of Justice Alito. Justice Alito. I don't think, in fairness, Mr. Asmey, that Mr. Cagle is saying the entirety of the conduct has to occur. At least that's not what I heard him say. But there has to be some conduct. An element of the tort essentially has to occur. Perhaps in the briefing he suggested that the SOSA norm violation has to occur in the United States, and that's Alito's view and didn't garner the Court's vote. And Morrison also instructs us to look at the focus of the statute and the focus, again, which could accommodate some extraterritorial conduct, the focus of the ATS, is remediating harms done by U.S. actors. I'd commend this Court to look at Judge Pooler's concurring opinion in the Chaudhary case in the Second Circuit, where she undertakes just this kind of analysis in an admittedly foreign-queued case. That's why she's concurring. But she anticipates that cases just like this would be covered. Regarding Mr. Cagle's suggestion that all of these techniques were authorized, I'd refer this Court to the Fourth Circuit opinion that was later vacated, but at least the opinions identified that some of the techniques were authorized, but clearly some others were not. And that's why four independent military investigations implicated khaki employees in the abuse and torture in Abu Ghraib and why several others were court-martialed. Regarding integration and control, Mr. Cagle's claim that it's undisputed is curious because it hasn't been adjudicated at the district court. We have not had an opportunity to submit the facts that would dispute their asserted claims of integration, and there is an enormous record that we could submit to dispute those facts. So he's saying integration isn't necessary, that plenary control ends the case on that issue. Yes, Your Honor, and there's no plenary control either by operation of the contract and the Taylor and Harris case, and also because of disputed evidence in the record that suggests that there was a command vacuum, that there was a separate command line of authority from the khaki that was separate from the military, including testimony from military officials themselves. And that's in the record below. It hasn't been adjudicated, and I think improper for the court to evaluate it now. With respect to CPA 17, I just would want to underscore that combat, the exemption for combat, connotes physical violence, and there has to be a line drawn, as the U.S. government suggests in its amicus brief, between physical violence and what is authorized combat and detention of civilians outside the battlefield. That's this court's holding in Passaro when the court said no battlefield interrogation took place here. This was a beating in a detention cell. And it does not undermine the role of this court to hear claims by civilian detainees abused abroad. It ennobles the court. All right, sir, thank you very much. The court will come down to brief counsel, and then we'll proceed to our last case.
judges: Barbara Milano Keenan, Henry F. Floyd, Max O. Cogburn, Jr.